* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioners Stephenson and Harris, and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Harris, with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing, and in the executed Pre-Trial Agreement, as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. This claim is a denied occupational disease claim with an alleged date of injury of February 5, 2004. The plaintiff has alleged occupational diseases to both knees and his right elbow.
3. At the time of this alleged occupational disease, Gallagher Bassett Services administered the claim on Sprint's behalf.
4. An employment relationship existed between the plaintiff and the defendant-employer at all times relevant to this claim.
5. The plaintiff's average weekly wage at the time of his alleged injury yields a compensation rate of $688.00 per week.
6. The parties stipulated to all medical records, reserving the right to depose the medical care providers.
7. The plaintiff has not returned to work for defendant-employer since February 5, 2004.
 * * * * * * * * * * *
Additionally, the Full Commission makes the following:
 EVIDENTIARY RULINGS
The defendants made Motions to Strike various portions of the depositions of Drs. Allen and Jackson, objections made by plaintiff's counsel Mr. Farah during cross-examination of Dr. Jackson and an opinion letter signed by Dr. Jackson on May 14, 2004, that was submitted as part of the stipulated exhibits. Based upon a review of said motions, the plaintiff's responses thereto and the defendants' reply, these motions were DENIED by the Deputy Commissioner, along with the plaintiff's Motion for Attorney's Fees in connection with his response to the Motions to Strike. The defendants argued before the Deputy Commissioner, and again at hearing before the Full Commission, that the pertinent portion of the deposition that they sought to strike contained a hypothetical questions that were not properly supported by the record. The Full Commission finds the Deputy Commissioner and the Full Commission, as the fact finders in this matter, possess the judicial authority to weigh the evidence of record before the Commission, which includes expert witness testimony, when deciding an issue at hand. Based upon such authority, the Full Commission finds it is not necessary to strike portions of Dr. Allen and Dr. Jackson's deposition testimony. Thus, the Full Commission, in its discretion, hereby upholds the Deputy Commissioner's denial of the defendants Motions to Strike, along with the plaintiff's motion for fees in connection therewith.
The defendants also made a Motion to Submit Additional Evidence, to wit: a "butt box" similar to the equipment that the plaintiff testified he used in his work for defendant-employer. Based upon the defendants' motion, photographs of the "butt box" were accepted into evidence by the Deputy Commissioner as Stipulated Exhibit No. 9, and such acceptance into the record is hereby upheld by the Full Commission.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, the plaintiff was age 59.
2. The plaintiff graduated from high school and enlisted in the Army. During his three years in the Army during the 1960s, the plaintiff received training in electronics equivalent to two years of college education.
3. Following his honorable discharge from the Army, the plaintiff worked some odd jobs, and worked as a transformer tester and as a television repairman. On October 23, 1979, the plaintiff became employed with defendant-employer's precursor, Carolina Telephone. Since that time, the plaintiff has remained employed with the defendant-employer.
4. The plaintiff's first job with the defendant-employer was as a central office repairman. He later became a repair service evaluator. On January 25, 1988, the plaintiff became a cable splicer with the defendant-employer and remained in that position until he was medically taken out of work in February 2004.
5. As a cable splicer, the plaintiff's job duties required him to work on both aerial and buried lines.
6. When he worked on aerial lines, the plaintiff climbed up and down ladders, typically carrying a tool belt that weighed approximately 25 pounds.
7. When he worked on buried lines, the plaintiff typically worked at terminals, which appear as approximately three-feet-tall posts sticking out of the ground. While he worked on buried lines, the plaintiff typically sat on a company-issued "butt box" that was approximately one foot in height. The plaintiff would sit as close as he could to the terminal, leaning forward with his knees spread apart and his body bent forward onto his knees in a squatting position, so that he could work on the terminal in front of and below him. When he was working on buried lines, the plaintiff got up from and sat down on the "butt box" often, for breaks and to retrieve supplies from his truck, during the course of the workday.
8. The plaintiff sometimes worked on buried lines in a ditch, either squatting or sitting on the ground.
9. The plaintiff also used a shovel to dig nearly every day.
10. As a cable splicer, the plaintiff spent at least 75 percent of his work time doing work that required squatting on the "butt box." He spent at least 15 percent of his work time climbing or standing on ladders.
11. The plaintiff's job duties were described by him, and former co-workers Alfred Holston and Eddie O'Briant, all of whom the Deputy Commissioner found to be credible witnesses.
12. Approximately four or five years before the hearing, the plaintiff began noticing physical problems with his knees. He reported these problems to his family physician, Dr. Somnath Naik.
13. Dr. Naik never told the plaintiff that his knee problems might be related to his work with the defendant-employer.
14. Based on Dr. Naik's referral, the plaintiff treated with Dr. David Allen from May 2001 through October 2003 for his knee problems. Dr. Allen never told the plaintiff that his knee problems might be related to his work with defendant-employer.
15. The plaintiff's health insurance changed, and Dr. Allen would not accept the plaintiff's new insurance. Therefore, the plaintiff was referred to Dr. Staley Jackson for continued treatment of his knee problems, and the plaintiff first saw Dr. Jackson on February 13, 2004.
16. Dr. Jackson has diagnosed the plaintiff with degenerative joint disease in both of his knees. Specifically, Dr. Jackson has diagnosed the plaintiff with Grade 4 osteoarthritis, which is the most severe level of osteoarthritis. Essentially, the plaintiff has no cartilage left on the bones in his knees.
17. Based on the plaintiff's application for short-term disability benefits, which was certified by Dr. Jackson, the defendant-employer paid the plaintiff short-term disability benefits.
18. Dr. Jackson medically restricted the plaintiff from performing his job duties as a cable splicer as of February 13, 2004, because, in part, of the plaintiff's degenerative arthritis in both of his knees.
19. The plaintiff's consultations with Dr. Jackson in February 2004 were the first time that the plaintiff was informed by competent medical authority that his bilateral knee condition was related to his work with the defendant-employer.
20. As of the date of the hearing, the plaintiff's application for long-term disability benefits had been approved by the defendant-employer.
21. As Drs. Allen and Jackson both testified, and the Full Commission so finds, the plaintiff's job duties as a cable splicer with the defendant-employer more likely than not placed him at an increased risk, as compared to members of the general public who do not perform such duties, for the development of osteoarthritis in his knees.
22. As Drs. Allen and Jackson further both testified, and the Full Commission so finds, the plaintiff's job duties as a cable splicer with the defendant-employer more likely than not significantly contributed to plaintiff's development of osteoarthritis in his knees and/or aggravated said condition.
23. As Drs. Allen and Jackson further both testified, and the Full Commission so finds, the plaintiff will need knee replacements in the future. Further treatment, including knee replacements, will provide the plaintiff relief and lessen his disability.
24. As of the date of hearing before the Deputy Commissioner, the plaintiff had difficulty getting up from a seated position, and needed something to hold onto when getting up. Walking long distances and climbing steps are difficult for him.
25. Because of the plaintiff's physical difficulties, coupled with the restrictions placed on him by Dr. Jackson, and given his educational and vocational background, the plaintiff has not been able to return to work in any capacity since February 13, 2004.
26. On or about April 22, 2004, the plaintiff filed a Form 18 with the Industrial Commission alleging injuries to his "left and right knees, left elbow" from "repetitive kneeling, squatting, climbing and pulling," with a date of injury of February 5, 2004.
27. The plaintiff sustained an unrelated injury to his right eye on October 10, 2003, that defendants accepted as compensable. Pursuant to a Form 21 filed with the Industrial Commission on or about July 23, 2004, the defendants paid plaintiff 120 weeks of compensation at the maximum weekly rate for 2003 ($654.00 per week), for the total loss of use of the plaintiff's right eye.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The plaintiff gave timely notice to the defendants of his claim for workers' compensation related to his bilateral knee condition. N.C. Gen. Stat. §§ 97-22; 97-58.
2. The plaintiff has abandoned his claim for compensation related to his right elbow. N.C. Gen. Stat. § 97-24
3. The plaintiff's bilateral knee osteoarthritis is a compensable occupational disease. N.C. Gen. Stat. § 97-53(13).
4. Because of his bilateral knee osteoarthritis, the plaintiff is temporarily totally disabled and has been since February 13, 2004. N.C. Gen. Stat. § 97-29.
5. The plaintiff is entitled to temporary total disability compensation, at the rate of $688.00 per week, for the period from February 13, 2004, through the present and continuing until further Order of the Industrial Commission, subject to the credit and attorney's fees hereinafter provided. N.C. Gen. Stat. §97-29.
6. The defendants are entitled to a credit, in the Commission's discretion, for the net (after-tax) short-term and long-term disability benefits that the defendant-employer has paid to the plaintiff at any time since February 13, 2004. N.C. Gen. Stat. §97-42. There was no evidence introduced at the hearing regarding the amount of such payments that the plaintiff has received nor whether the disability plan(s) were fully funded by defendant-employer; however, the plaintiff concedes in his brief (at pp. 15) that the plan(s) were employer-funded.
7. A claimant cannot collect permanent partial disability benefits for the same period in which the claimant is collecting indemnity benefits. See Collins. V. Speedway Motor SportsCorp., 165 N.C. App. 113, 119, 598 S.E.2d 185, 190 (2004). Thus, the defendants are entitled to a credit for any permanent partial disability compensation they have paid to the plaintiff pursuant to N.C. Gen. Stat. § 97-31 for his prior unrelated right eye injury when such benefits were paid concurrently with the temporary total disability benefits awarded to the plaintiff pursuant to N.C. Gen. Stat. § 97-29 for the injury to his knee.See Collins at 119 and 190.
8. The plaintiff is at substantial risk of the necessity for future medical treatment for his compensable bilateral knee osteoarthritis, and is entitled to have the defendants pay for such future treatment as well as the past treatment that the plaintiff has received with Dr. Jackson since February 13, 2004. N.C. Gen. Stat. §§ 97-2(19), 97-25, and 97-25.1.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Subject to the credits and fees set forth below, the defendants shall pay temporary total disability compensation to the plaintiff at the weekly rate of $688.00 from February 13, 2004, and continuing until further order of the Commission. The portion of such compensation that has accrued shall be paid to the plaintiff in lump sum.
2. Defendants shall pay the costs of all past and future medical treatment, rendered by Dr. Jackson and/or any other medical provider since February 13, 2004, related to the plaintiff's compensable bilateral knee occupational disease. Dr. Jackson is hereby designated as the plaintiff's treating physician, and the defendants shall authorize and pay for the treatment that he recommends for the plaintiff's compensable bilateral knee occupational disease, including but not limited to diagnostic testing.
3. If not already done, the parties shall confer in order to determine the amounts that the plaintiff has received from the defendant-employer for short-term and/or long-term disability payments during the period from February 13, 2004, through the present and to determine what amount of such payments, if any, to the plaintiff will be on an ongoing basis. In the computation of temporary total disability compensation due to the plaintiff, the defendants shall receive full credit for the net (after-tax) short-term and/or long-term disability payments the defendant-employer has heretofore made and/or will make to the plaintiff, subject to the provision below for the plaintiff's counsel's attorney's fees.
4. The defendants shall be credited for any permanent partial disability compensation they have paid to the plaintiff pursuant to N.C. Gen. Stat. § 97-31 for his prior unrelated right eye injury when such benefits were paid concurrently with the temporary total disability benefits awarded to the plaintiff pursuant to N.C. Gen. Stat. § 97-29 for the injury to his knee.
5. The defendants shall pay to the plaintiff's counsel a reasonable attorney's fee in the amount of 25 percent of the compensation awarded to the plaintiff herein, subject to the credit provided above. The portion of such fees that are based upon compensation that has accrued shall be paid directly to the plaintiff's counsel in a lump sum. Thereafter, the plaintiff's counsel shall receive every fourth check of compensation due the plaintiff.
6. The defendants shall pay the costs.
This the 8th day of May 2006.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ DIANNE C. SELLERS COMMISSIONER